My name is Lance Curtright, and I represent Petitioner Leslie Odelia Cabrera. Your Honors, the Court is confronted with two issues today. The first pertains to the denial of Cabrera's application for asylum, and the second pertains to the denial of her application under the Convention Against Torture. In the interim of the motion to stay and all that, I guess, ICE granted her a stay. Is that it? Yes, she's been allowed to stay until November. I'd like to address the asylum application first, Your Honors. If you lose asylum, I mean, that's the end of the case, right? No. You can't go – how can you go for the next? Well, I have two applications pending before the Court, but they're all in the same case. Right. So the asylum application and then alternative is the relief under the Convention Against Torture. They're different analyses. Well, I mean, it just seemed to me if you win asylum – I mean, if you can't win asylum, you can't win your torture case. No, I can. Okay. And I can explain that now. We'll get into it later. But I think the central issue before this Court is the nexus for asylum purposes. And the central reason why Cabrera fears persecution in Honduras is on account of her politics and her political activism in that country. The board attempts to center her fear based upon rampant criminality in that country and because she's the victim of a robbery in 2014. But that's not why Cabrera fled Honduras, and that's not why she filed for asylum. Start first with her testimony, both written and oral, which was found to be credible by the immigration judge. She testified in both her affidavit and her oral testimony that she fears returning to Honduras because of her political opinion and her political activism in that country. Not once in her oral testimony does she say she fears returning to Honduras because of rampant criminality. It's important to note that Cabrera is not a typical Honduran asylum applicant who is running from the crime of her country. She has a political opinion in opposition to the gangs, yes, but she acted in furtherance of that political opinion. She was involved in a parent's group where they went to the police station and demanded more protection for the children in her school to protect their children from the gangs who were attacking them. She actually became active in the political party, the Libre political party, who supported candidates who reflected her political opinion, which was pro-rule of law, anti-gang, anti-corruption. She campaigned for these political candidates for office. How big a political party is that? I'm not sure of the exact size, but it's a major political party noted in the country. I believe it was founded by the prior president, Manuel Zelaya, but I'm not 100 percent sure of that. But it's a well-known political party in that country. And a big political party. I'm sorry? A big political party that is a factor in the elections. Yes, sir. It is. Well, what about this group identifying a group as the females that are anti-gang and politically active? Is there anything formal about that, or is it just observing that there are a bunch of women who do this? I think the reason why it's a particular social group is that there's not a bunch of women who do this. I think it's a particularly well-defined group that is small, and she's part of it. And Dr. Boardman, the expert who testified, said that women in that situation are like low-hanging fruit for the gangs. They oppose her because of her gender. They don't like it when women challenge them, and they don't like her politics, which is anti-gang. Now, that issue as far as particular social group was not really decided by the board. The board just focused on the nexus issue and did not address whether she had a particular social group or whether her political opinion was a valid one. So both of those things, I would submit, are found by this court. And the sole issue as far as asylum goes is whether, on account of that group and on account of her political opinion, whether her fear is on account of that – of those bases. And in that respect, I think Dr. Thomas Boardman's unchallenged expert opinion is dispositive. Dr. Boardman has testified in the credential as an expert in over 300 cases. He actually went to the part of Honduras where Ms. Cabrera is from, and when he was there, he actually interviewed Libre Party members. And in interviewing them, he recognized that – was able to find that those party members did suffer reprisals for their political opinions and were tortured and persecuted on account of them. In Dr. Boardman's written and oral testimony, he stated specifically that Ms. Cabrera will be targeted on account of her politics. He stated that she is at tremendous risk on account of her politics. Not once in his written or oral testimony did he say that she fears returning because of her crime in Honduras, like the immigration judges said. So when the court is confronted with a qualified credentialed expert who has given reliable testimony, that is dispositive to the factual issue presented. The immigration judge did not provide any reason for disregarding that expert opinion. Rather, he supplanted his own speculation in lieu of an expert who has actually been to Honduras and the credentialed expert on more than 300 occasions. That was erroneous, and the record compelled finding separate from what – opposite from what the immigration judges found. Now the government, in their brief, says that the reason why Cabrera should be denied is because she was not harmed in the past on account of her political opinion. But that's not the issue because Cabrera is claiming she will be harmed in the future because of her political opinion and her political activism. What showing was there made that the gangs are truly a part of an influential party that operates within the government? Well, yes, the government – the expert, Dr. Thomas Boardman, testified about that specifically. That's what I'm asking. What was said about that? He says that they're so indivisible that separating them would be like trying to separate the water from the ocean. They grow up together in the same neighborhoods and they – So all the gangs are politically active, you're saying? The gangs have a political component where they collude with the government in power, yes. And that is – I think that is firmly established by the expert opinion. But they're not politically active. I mean I don't quite – Well, I think the gangs are politically active. In other words, is the establishment afraid of them or do the gangs involve themselves into politics? I think they are both afraid of them in some levels, and they are using them for their gain in politics. I mean they are – was there any evidence – are they appointed to political or governmental offices and that sort of thing? Oh, the gangs don't have like a political party. No, I think it's more backroom clandestine type of arrangements that they have with the gangs. However, there is evidence in the record that the gangs do control large neighborhoods in Honduras, and they have their own rules of law, their own structure. Well, if they try to influence the government through those gangs in the neighborhood, do they get out the vote or declare themselves for a particular candidate or anything of that? I think it's more political activity in the negative sense. They intimidate the vote, and they persecute people who stand for candidates who oppose them and their ends, which are power and maintaining the gang. The number one rule of the gang is the gang is what is the most important thing in life. And anyone who is against that, against corruption, against violence, the gang does actively try to oppress them, and they have – They're against law enforcement. Well, yes, but it's more complicated than that because law enforcement are in bed with the gangs. Again, they're indivisible, as Dr. Boardman says, in many situations. So as the – Is that just corruption or is that politics? It sounds just corruption to me. Is it just corruption or is it politics? I'm afraid corruption might be politics in Honduras. Yeah, I think – Probably not just in Honduras. Maybe not. Maybe not. Did the expert testify as to any gang members actually getting elected to government positions? He did testify about that. I don't know if an actual gang member has been elected to office, but I did think he testified that on the upper levels of Honduran society, there are nefarious deals that are taking place behind closed doors. I'm not sure he actually – Not direct elections of gang members. Right. I don't think there's an MS-13 political party. I think they're using MS-13 to quash political opponents, and that's what the supporting document says. You look at page 451 of the record. What party do they do that in behalf of? National Party is what was happening in this case. So the National Party and the gangs are colluding together. Is that the testimony? I think that's what the record shows. Yes. In fact, the vice president of the Honduran Congress indicated that about – he estimated 40 percent of the police chiefs in Honduras were members of organized crime. So you have this going on at the lower levels of society where people like my client are putting on campaign for mayor and putting up campaign posters, and she's at risk from the gangs in her neighborhood acting in coordination with the local candidates. And then I think at the upper levels, it's going on too, Dr. Borman testified, but it's more nefarious and maybe more hidden. But this issue of whether she was harmed in the past based upon her politics is not one that I think the court should rely upon because Dr. Borman, in his unchallenged expert opinion, stated that she became visible by being involved in the parents group and by campaigning for Libre Party members. He said that there's no timeframe for when these gangs will take their reprisal, but part of the culture of the gang is that they don't forget. What was her political activity in behalf of the Libre Party specifically where she would be identified as a Libre Party supporter? She was involved in the campaign for mayor in her area, and she was out putting up campaign flyers. For a particular candidate? Correct. I believe the candidate's name was Mr. Mejia. Did she identify other than to put up campaign signs for him? I'm sorry? Did she identify herself with the party other than to put up campaign signs? Well, she went to a protest at Central Park, San Pedro Sula. I'm not so sure that she did more than that other than campaigning actively for their members, Judge, which I would submit is enough for her to be politically active. But I'm asking about more political activity than putting up signs. Yes. Well, she was politically active also with her parents group when they went to the police station and demanded more security at her school. Also, she took part in a protest at a park demanding for general social justice issues in Honduras. But not identified with any political party? I don't think that was necessarily identified. So she kind of started with the parents group at her school, and she blossomed into this member of the Libre Party, always wanting pro-rule of law, anti-corruption, and no more gangs. Turning to the Convention Against Torture, Your Honors, I think the most important issue in that respect is that the lower courts applied the wrong legal standard in that case. The Board of Immigration Appeals affirmed the immigration judge since she looked at his decision, and the immigration judge stated that she bossed her case because she could not prove the entire government of Honduras would acquiesce or be involved in her torture. That's not the legal standard. The regulation only says that she must show that a public official would so acquiesce or be involved in her torture. This court recently, a few months ago, in the case of Uruguas Valdez v. Yates, clarified that standard and says that the government official involved in the acquiescence to torture does not need to be a high-level member of the Honduran government, but it can also be a lower-level member of the government, including local police. What is the torture? The torture is fear of future persecution. Dr. Borman said she's at a tremendous risk of egregious harm, which I presume includes death. Your expert testified that she was likely to be killed. He said egregious physical harm. For putting up signs for doing what? Yeah, for opposing the gangs. For opposing the gangs. And as expressed through her support of Libre candidate members who are also in opposition to the gangs. So those two things are connected and they're tied together. So the record shows that there is a risk of persecution, including torture, and that is going to be at the acquiescence or involving the local police because, again, they're not divisible. They're not divisible. And so that – the court is somewhat deprived of the ability to give that analysis a fair shake because the lower courts didn't apply the correct legal standard on that issue. I mean that's reason alone for the court to remand it with instructions to apply that legal analysis correctly. Well, like in terms of torture, does that – what does that require, torture? Extreme cruelty, physical abuse, extreme cruelty. And it always involves some physical abuse? No, it can be mental too, emotional. And I think it can involve threats of death as well. So it's not necessarily just physical. A threat of death is torture under the statute? I believe that is under the regulation, yes. And if you look at the supporting records in the documents, there's plenty of evidence to indicate that that sort of activity is very common in Honduras. And I don't think there's even a meaningful dispute between the parties here that torture is a problem in Honduras. I would say that the record also supports and compels a different finding from the IJ on that issue as well. Thank you, Your Honors. All right. Thank you, Mr. Cohen. Mr. Rubin. Good morning, Your Honors. May it please the court. Arthur Rubin on behalf of the attorney general. The agency, substantial record evidence supports the agency's decision to deny asylum, withholding removal, and CAP protection, Convention Against Torture Protection. And the reason for that is this. As to asylum, you cannot get asylum in this country just because something happened to you or you fear something in your country. It has to be based on a specific statutory reason, that is, your political opinion or your membership in a particular social group, your nationality, something like that. And in this particular case, the board and immigration judge noted that the alien, the petitioner, could not establish that connection, that nexus, because the statute specifically says that in order to receive asylum, you have to demonstrate that that statutory ground played a central role in your persecution. Now, in this case, counsel has conceded that the events that happened to her back home in Honduras did not rise to the level that he says would be grounds for asylum. That is, it's not past persecution. So what happened to her? Well, in 2012, her son was assaulted outside of school, and that concerned her, as any parent would be. And so she came to the school and said, what are we doing to protect our children from these gang members who are robbing and assaulting our kids? And the parents said, you're right. And so along with the parent, the existing parent group, she went to the police station, and outside the police station, they requested, held up signs saying, you know what? We need to protect our children. And in response, the police sent out a patrol car for a couple of weeks, and that's about it. About a year later, and then she didn't do anything politically or anything else for a year. And then about a year later, she became involved in another protest, and this one was about lower gas prices, lower food prices, and again, protecting kids. So then nothing happened to her again until a year later, when she was robbed at a gas station. Neither time did any of these incidents or gang members ever approach her and say, oh, you know what? We are going to rob you, assault you, or hurt your child because of your participation in the parent group or your participation in handing out these flyers, as counsel noted, to help elect this gentleman she didn't even know, Mr. Mejia. The only reason she was doing it, it wasn't because she was a member of that party. She was only doing it because one of the parent group parents, Mr. Pena, was involved in handing out flyers, and she decided to help him. Now, she handed out flyers on the streets, and she hung up posters, but at no time did anybody ever approach her and threaten her or do anything to her. So here's the crux of the issue. Even though this expert, Mr. Borman, testified that she now has a valid fear of returning back to Honduras because of these activities that nothing ever happened to her before, because he claims that the gangs would somehow find out that she had done this in the past, but there at no time when she was in the country, there's no evidence they ever became even aware that she did any of these things. So even when she was back in Honduras, there's no evidence whatsoever the gang members were aware and did anything to her as a result of her political opinion or her membership in a particular social group of women who are fighting for human rights or against gangs. So, moving on to the cap issue, now counsel notes that this decision that he supplementally cited somehow controls our case. That is not, not the case here because this case stands at odds to our case. In fact, in here, in this Uriegas-Valdez case that he supplementally cited, there the court sent the case back because they found that the board did not address an issue, and that issue was because the alien had provided evidence that police officers were involved in Mexico with the Zetas gang who had executed some 400 people and members of this gentleman's family, the board should have addressed that evidence. Rightly so, but in our case, there's no evidence whatsoever that any police officer was ever involved in anything that the gangs were doing to her or her family. Now, there is evidence that some members of her family were involved in altercations with gangs and over a period of years, in random incidents, some of her cousins, a brother-in-law, and some nephews were killed by gang members. These were not related to a coordinated effort by the gangs to kill her family members as it was in the Uriegas-Valdez case. So, in contrast to Uriegas-Valdez, what happened to her family is random, complete lawlessness, acts of violence and murder that happened just randomly to her family does not indicate that there's a similar pattern against her own family. Thus, this case is completely distinguishable, and the court should not find that it in any way relates to our case. Now, one of the things about well-founded theories— What is the nexus we have to find if we were to reverse the board or the IJ? I understand Your Honor's question. If you were to reverse the board, the nexus would have to be that the court somehow finds that these things that she did— involving parent group, handing out posters—somehow indicated that the gangs would retaliate against her based on her political opinion. So we have to find that no reasonable fact finder could find a nexus between her membership in the women that oppose gangs and her fear of whatever it is, torture or whatever. I would say, Your Honor, you would have to find not only that a reasonable fact finder would find that, but the statute— No reasonable fact finder could not find that. But the standard is that the evidence would have to be compelling. The court would find that the reasonable fact finder would not be compelled to find something. That's the standard under 8 U.S.C. 1252. So the petitioner's burden here is to show a compelling reason for reversing. And we would submit there is no such reason because even though the expert testified that somehow by returning to Honduras, these gangs would somehow find out about her activities in Honduras from years ago, well, he would have to find—or the court would have to find that these were objectively reasonable fears. And that's what the expert just could not establish for the immigration judge and the board for them. Because in order to do that, to move beyond the sphere of speculation, which is what Dr. Borman was doing, he was merely saying he was extrapolating based on evidence of what might possibly happen to her if the gangs possibly found out. The problem, the connection he never made was that the gangs would find out. That is, if they had never become aware of it before, they had never threatened her when she was actually living in that little town. Yeah, but, I mean, you got right down to it. I suppose your argument is that if she had shown that the gangs would kill her if she returned because they had opposed—because she had opposed the gangs, that would not get her asylum in the United States. She's got to show that it was for a particular reason. That's correct. Yes, Your Honor. Yeah, it cannot just be mere lawlessness. It cannot be just her fear of murder or violence. Otherwise, Your Honor, we would open up the floodgates. She's got to show that the gangs would hold—the gangs would kill her for a political motive. That is correct, Your Honor, because she has to establish that nexus to a political motive under the statute, under this court's case law. And she has not done so here because, you know, for all intents and purposes, the gangs never bothered her because they never saw her as a person in opposition. They just saw her as a concerned parent who wanted to protect her child. And, you know, there's a bunch of folks on the parent group that were doing the same thing, and nothing happened to them either. There's nothing in the record to show any of them was killed or— But they surely exposed themselves to being killed. Yes, Your Honor. Yeah. I mean, at this point, she— But you're not concerned about that. Well, it's—obviously, it's a tragic situation, Your Honor. I mean, Honduras, you know, as far as I know, it may still be the murder capital of the world. It is a very, very dangerous place. Does that mean we allow every Honduran to be transplanted to the United States just because they have a run-in or a beef with some gang member? She doesn't get justice. She gets the law. That's what you're saying, right? Well, Your Honor, the law says, according to Congress, that asylum can only be granted on one of the protected qualifying grounds. And none of those grounds are possible sympathies to her plight. You know, and I'm sorry for her, but that is the law. And as the tragic situation may remain there, she is exposed to the same risk that every Honduran is. Well, if she proves or has proved by her testimony and her expert that she is a member of this class of women who actively oppose violence or gangs or whatever, what else does she have to prove to get asylum? Okay, so if the court finds that somehow she has established a nexus to a protected group of this amorphous group of women that nobody can seem to identify because she has not shown that such a group is identifiable in the Honduran society because the law requires that to be a particular social group, that group must be distinguishable in that society and socially. Hypothetically, she has shown that. What else? Then at that point, the court would have to send the case back to see if the group that she identified is what the board considers to be a particular social group, because the board never reached that issue. The board only said you never showed a connection at all to even the hypothetical group. That is, there was no nexus to what it is that you're trying to establish to the ground because what you established was that you were – your son was beat up and robbed and you were robbed one time. And so at that point, how do we – How do we establish that she campaigned or actively handed out – But that's a political ground you're on. That's not her membership in a particular social group. The particular social group she says is the vulnerable group of women who oppose gangs, not for political grounds. She didn't say that it was a group of us women who get around walking around with placards and we're visible to the whole society. How else can you oppose gangs? Well, there are many ways to oppose gangs, and some people testify in court against gangs. Other people may kill a gang member. I mean, there's many ways, but in this particular way, the way she says she opposed gangs was by joining the parent group to protect her child and by – well, there is no indication in the record that she actually was helping elect Mr. Mejia because he opposed gangs. That was part of what he was about, but he was part of this third party in Honduras. There's two big parties there, and this little third group party was coming up called the Libre Party, and that's who she decided to vote for, or at least not vote for but to assist in electing one of their people to campaign for. So there's no reason to believe that she was doing it because she opposed gangs. She just liked that candidate. I mean, there's nothing in the record to show that she voted – you know, she didn't specifically say, I voted him elected because he was going to end gang violence and protect our children. That's not in the record. I mean, your argument underscores the general rule that justice and the law are not synonymous terms. Your Honor, I – I mean, I would better differ because, you know, I understand your honest concern, but sometimes in justice there are broader interests, and here – I like the law. That's what I'm saying. Everybody's talking about justice. They're certainly not talking about the law necessarily. They're not synonymous terms. You're not required to agree with the assertion. Yes, Your Honor. But I would say that, you know, we would be doing justice because there is no reason to believe that this woman – her sisters and her brother and her mom still live in that same town. Does the record say they did what she did? It doesn't say that they did what they did, but what she did did not necessarily expose her to danger because nothing ever happened to her. That's debatable. Well, but I'm saying her family's been subject to random acts of violence, but her eight sisters or siblings who remain have been remaining there and living unharmed. So, you know, to say that we would be doing justice by sending her back or injustice by sending her back, that's not the case because there is no evidence to show that anything would really happen to her. Well, that's not her point of view, I guess. Well, I would imagine not, Your Honor. So remaining back, her children and I guess other family remain there in Honduras? That's correct, including her close family. There's a lot of her half-sisters on her father's side, half-sisters or brothers on her father's side, and her mother. So beyond the expert's testimony, was there introduction or development of, like, the situation on the ground there in Honduras, you know, sort of contemporaneous evidence, for want of a better word, to support, you know, her contention? I mean, I know what you said, Dr. Borman, sort of extrapolated from past facts, right? Yeah. So I'm saying during the hearing or before the board, was there any evidence? In other words, my sisters and brothers are back home, the gangs are surrounding the house, et cetera, et cetera. Yeah, no, there's no other evidence, Your Honor, because the situation is lawlessness in poor areas. In the middle-class areas and upper-class areas, you know, people are doing barbecues on their lawns. But in the areas where the poor folks live, that's where the gangs reside in these boroughs. And so, yes, you know, but there is no evidence that she would return to that particular region or that particular city. I mean, she's not, you know, her son's definitely not going back. She testified she would not be, you know, her son would remain. He's got status in this country. His case was administratively closed. But she would, and she does have family members, supporting family members, there that would be assisting her. So it would not be an injustice. Where is she now? Is she incarcerated? No, Your Honor, no. She, as Your Honor knows, there was a stay motion filed for this case because, you know, removal was pending. She probably won't ever be removed either. I mean, at this point, Your Honor, I think she's got to stay until, I think, November. She's lost somewhere now, I imagine. So subject to Your Honor's questions, that concludes my argument. All right. Thank you, sir. Thank you, Mr. Cutler. Your Honors, we're here today speculating about what might happen to my client in Honduras. But we don't have to because Dr. Gorman went to Honduras. He was there in November 2014 and visited the town where she's from and spoke to the actual party members that she's affiliated with. And his testimony, which is unchallenged, undisturbed, and reliable, is that she is at tremendous risk of physical harm on account of her political opinion. And he doesn't say it's because of crime, and he doesn't say it's because of criminality. What is her political opinion? She is pro rule of law, anti-corruption, and anti-gang, as expressed by her support of the Libre Party. And that issue is squarely before the court. We brought up the political opinion from the immigration judge, and we argued it from the Board of Immigration Appeals, and not a single immigration judge gave us any time on that issue. So her political opinion is she is against crime and corruption. Which is a political issue in Honduras because the gangs are running the country. Well, that may be an overstatement, isn't it? It's a political issue. The gangs are running the country, not the government of the country. Let me backtrack. They're not running the country completely, but they are very much involved in the running of the country. And the day-to-day life of people that live in a certain part of the city and country. Certain parts they are definitely running the entire place in certain elements. So this is a factual issue. Is there a nexus? Is the central reason why she fears persecution on account of her political opinion? There's no evidence on that other than the expert opinion. The expert opinion's unchallenged, undisturbed opinion is that she does have a well-founded fear on account of that opinion. The government did it even more direly because he was so well credentialed. Credentialed in over 300 similar cases. So the immigration judge ignored the expert opinion and ruled against a straw man. Ruled against a straw man saying you're not afraid of your politics even though your credible testimony is that you are. You're afraid because there's crime in Honduras and because you're a victim of a robbery. That's not why she filed for asylum. She filed for asylum because she witnessed members of the parents' group be threatened by gangs after he penned up some campaign posters. That's in the record. And that's why she should be granted asylum. What are the specific threats she received? She did not receive a specific threat herself, but her son— Is that telling? Excuse me? I mean, is that telling? No, Judge, because if you look at Dr. Borman's expert opinion— Yeah, but he's an expert. He's extrapolating. We all know that, and we know any fact finder doesn't have to accept an expert testimony. Expert testimony is designed to be helpful to the fact finder. It's not the gospel. You know that. It's helpful. So unchallenged? I mean, that can be a trial strategy. People don't challenge a witness if they don't think it hurts them. So, I mean, we can only read— Those of us who've been in the trial gallery before, we know there are a lot of reasons why that could be the case. If the witness isn't hurting you, you don't challenge it, yada, yada, yada. You don't call your own expert, et cetera. So there's only so much you can glean from that, right? Okay, so I'm saying we got you in terms of what Dr. Borman said. We read it. I'm simply asking, since it's an individual petitioner, what specific threats she received that she can testify first person to the board below to say, this is what I got. I got all these phone calls. I got hang-ups. I got a noose in the tree, et cetera, et cetera, beyond what he did. That's what I'm asking. Okay, so her son was beaten by the gangs because he didn't join them. That's the first thing that happened. And then one of the other members of the parents' group was also threatened for death for putting campaign flyers in the neighborhood. That's not directly to her. I concede that. But it does show a future possibility of harm to her. I think that's an important distinction. When you look at the other cases, I mean, that are out there, and I'm not saying you've got to have all of that, but would you acknowledge, I mean, there are other cases where there is evidence, more concrete than here, of threats aimed at the person who's asking for the asylum, as opposed to painting a picture of a landscape in which it occurs and I'm in the landscape. You follow what I'm saying? I'm sure there are cases that are more concrete, but I don't need to show the most concrete case. I just need to show a well-founded fear of future persecution, which I certainly have done on this record, Your Honor. There's no evidence to say otherwise. Well, I mean, it's on appeal. It's before the board who hears it and listens to it who heard the same thing. We're an appellate court, right? We say is there substantial evidence in the record. We're not hearing it de novo, correct? No. Right? Right. Well, on this factual issue. Now, on that CAD issue, that's de novo. That's a legal error that they made on that issue. But on this issue of asylum, that nexus, I have to show that substantial evidence in the record compels a different finding, and I think that I've done so because the immigration judge decided to do nothing in support of his decision. All right. Thank you, Your Honor. You're able, counsel, and thank you for answering the court's questions. Thank you also, counsel, for the argument put forth. We'll take the case under submission. Before we hear the-